## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SAMSON "SAM" COSTALES,

        Plaintiff,

v.                              CIV No. 07-827 MV/ACT

RAY SCHULTZ and
ALBUQUERQUE POLICE DEPARTMENT,

        Defendants.

## MEMORANDUM OPINION AND ORDER

### Introduction

**THIS MATTER** is before the Court on Plaintiff Samson "Sam" Costales' ("Costales" or "Plaintiff") "Motion for Discovery Sanctions on Defendants Ray Schultz and APD ("Defendants" or "Chief Schultz" or "City" or "APD") for Violation of this Court's Discovery Order and for *In Camera* Review and Production of Schultz E-Mails Reflecting Fraud by these Defendants" ("motion for sanctions"), filed September 23, 2008.  [Doc. 99.]  The motion for sanctions is fully briefed [Doc. Nos. 102, 104].   In addition, the Court allowed Defendants to file a surreply in response to some of the discovery issues raised in Plaintiff's reply.  The surreply was filed November 24, 2008. [Doc. 112.]  The Court initially scheduled a hearing on some of the issues raised in the briefing. However, upon further review, the Court determines that a hearing is not necessary and will issue an order vacating the hearing.  After careful consideration of the pleadings and exhibits, including the surreply, and the pertinent law, the Court concludes that Costales' motion for sanctions should be granted in part and denied in part.

**Factual Background**

Costales brings this § 1983 lawsuit against Defendants, arising out of an incident occurring on August 9, 2006, that involved the arrest of Al Unser by two Bernalillo County Sheriff's deputies in Albuquerque, New Mexico.  A third sheriff's deputy was present.  At the time, Costales was on duty as an Albuquerque Police Department ("APD") officer and witnessed the arrest of Mr. Unser. Costales believed that the deputies' treatment of Mr. Unser during the arrest was inappropriate and extreme.  Costales reported the deputies' alleged misconduct to one of his APD supervisors. Costales claims that at the criminal trial of Mr. Unser, all three of the Sheriff's deputies who testified lied about their interaction with and their conduct during the arrest of Mr. Unser.  Costales was subpoenaed as a lay witness to testify about his observations of the arrest.  His testimony contradicted the deputies' testimony.  [Doc. 20, Joint Status Report.]

As a result of Costales' report of the alleged misconduct and trial testimony, he claims he became the victim of retaliation and defamation by APD and Chief Schultz.  His civil rights complaint initially asserted claims against a number of Defendants, including APD and Chief Schultz.[1]  [Doc. 70, Amended Complaint for Deprivation of Civil Rights, Slanderous Defamation, Constructive Retaliatory Discharge and Spoilation/Destruction of Evidence.]

Defendants deny Costales' contentions and affirmatively state they did not engage in any retaliatory, defamatory or other tortious conduct against Costales.  Defendants claim their actions were motivated by legitimate, non-discriminatory business reasons and were made in good faith and in a reasonable manner, given the existing information and circumstances.  Defendants further assert that Costales' claims are barred because his statements did not relate to matters of public concern

---

[1]Darren White, James Badway and the Bernalillo County Sheriff's Department are no longer Defendants in this lawsuit.

and were made in connection with his official duties and responsibilities as an employee of the City of Albuquerque.  Defendants also contend that Chief Schultz's actions were objectively reasonable under the circumstances and authorized by clearly established law, entitling him to the defense of qualified immunity.  [Doc. 20.]

**Procedural Background**

This discovery dispute initially arose out of a Motion to Compel Discovery filed by Costales in May 2008.  [Doc. 62.]  On July 2, 2008, the Court entered an Order granting in part and denying in part Costales' Motion to Compel ("Discovery Order").  [Doc. 89.]  The Discovery Order directed Defendants to provide supplemental answers to some of Costales' discovery requests by July 22, 2008, four days before the close of discovery.  [Doc. 89.]

Defendants' deadline to produce the supplemental discovery passed without any production. Defense counsel states that "for unknown reasons, the receipt and terms of the [Discovery Order] were not noted and the deadline for discovery production was not calendared."  [Doc. 102, p. 2.] Defense counsel admits the failure to timely comply with the Discovery Order but claims it was inadvertent.

Plaintiff's counsel initially did not notice that Defendants failed to produce the supplemental discovery because they were preparing for trial and were in trial in August 2008.  On August 27, 2008, Plaintiff's counsel notified defense counsel of Defendants' failure to comply with the Discovery Order.  Plaintiff's counsel was informed that defense counsel, Kathryn Levy, was out of the country until September 3, 2008.  [Doc. 99.]

On September 4, 2008, Plaintiff's counsel asked defense counsel when Plaintiff could expect to receive the supplemental discovery that had been due on July 22, 2008.  Plaintiff's counsel claims she was told Defendants would produce the discovery on September 9 and then on September 10,

2008.  According to Plaintiff's counsel, Defendants provided some but not all of the information on September 11, 2008.  [Doc. 99, p. 2.]

On September 12, 2008, Plaintiff's counsel notified defense counsel that not all of the information was provided as directed by the Discovery Order and gave Defendants until September 15, 2008 to produce the additional information.  During the lunch hour on September 15, 2008, Ms. Levy personally hand-delivered some additional documents to Plaintiff's counsel's office.

Among the hand-delivered documents was a cover letter describing the enclosed documents and a stack of e-mails.  A paralegal with Plaintiff's counsel's office reviewed the documents while Plaintiff's counsel, Randi McGinn, was out of the office.  The paralegal flagged what he considered to be important documents.  Upon Ms. McGinn's return from lunch, the paralegal informed her that among the materials he reviewed was a document indicating that Chief Schultz said he was not going to produce a true copy of his calendar for the relevant dates, regardless of the Court's Order, and that he was willing to go to jail rather than produce a true copy of the court-ordered document. [Doc. 99, p. 3.]  Ms. McGinn asked her paralegal where this information came from, and he told her the communication was found in an e-mail communication between Chief Schultz and Ms. Levy. At that point, Ms. McGinn asked to see the cover letter submitted with the documents and advised her paralegal not to reveal the contents of any other e-mails.

In the cover letter, Ms. Levy stated:

> Request No. 6:  Attached is a privilege log, stating the dates of emails to and from Chief Schultz which are claimed to be privilege. [sic] The emails are between client and counsel and are identified by date and subject matter (Costales litigation).

[Doc. 102, Ex. C, p. 2.]  Nothing in the cover letter indicated that the actual e-mails were being produced, nor would there be an expectation that the e-mails were being produced in view of the

description of the privilege log.  Further, in Plaintiff's reply, Ms. McGinn acknowledged when she reviewed the cover letter that she realized Defendants intended to produce a privilege log, rather than the actual e-mail communications.  [Doc. 104, p. 2.]  Notwithstanding the cover letter's description of what was supposed to be enclosed, Ms. McGinn's paralegal reviewed at least some of the actual e-mail correspondence between Chief Schultz and Ms. Levy.

Once Ms. McGinn realized the information described by her paralegal came from privileged communications, she sealed the e-mail communications in an envelope, set them aside, and instructed the paralegal not to discuss their content with anyone else in the office.  On that same day, September 15, 2008, Ms. McGinn faxed Ms. Levy a letter informing her that instead of producing the privilege log, as indicated in Ms. Levy's cover letter, Defendants had produced the e-mails themselves.  [Doc. 102, Ex. E.]  Ms. McGinn wrote: "Since I do not know whether the delivery of these e-mails came out of a sudden burst of candor on your part or was a mistake, I have not looked at any of the e-mails."  [Id.]

Ms. McGinn further informed Ms. Levy that since some of the information about which she was informed "may indicate a fraud upon counsel and the court relating to the discovery, I cannot return these documents to you. . . ."  Instead, Ms. McGinn proposed submitting the sealed envelope containing the e-mails to the Court along with a brief on the alleged crime-fraud exception to the attorney-client privilege.

Upon receipt of Ms. McGinn's September 15 letter, Ms. Levy responded in writing, stating that "[o]bviously, the emails were delivered in error and are, in fact, privileged documents as

described in my [cover] letter to you."[2]  Ms. Levy's letter also stated that the calendar produced to Plaintiff was Chief Schultz's entire calendar and was downloaded directly from his computer at the City of Albuquerque.  Ms. Levy further explained that "Chief Schultz was clearly joking when he referenced that he would go to jail before he would produce his calendar.  Chief Schultz and I have a long history of banter in our emails; it does not mean that he would ever violate a court order.  He has not done so in this case."  [Defendants' September 15, 2008 letter to Plaintiff's counsel.]

Ms. Levy also informed Ms. McGinn that Chief Schultz would provide an affidavit to the effect that he produced his calendar and that it is the only calendar he keeps.  "In an effort to respond to your demand that the order also requires a log identifying who he met with and the subject of the meetings, we are looking to see if there are any meetings not reflected on his calendar.  That is part of the log we are finalizing . . . ." [Id.]  In addition, because Ms. McGinn challenged Chief Schultz's honesty, defense counsel told Ms. McGinn that Chief Schultz would agree to allow a computer specialist of Plaintiff's choosing access to his computer to confirm that the documents produced included his entire calendar for the time period specified in the Court's Discovery Order.  Moreover, Defendants agreed to pay for the examination.  Ms. Levy asked Ms. McGinn to advise her whether this proposal was acceptable and further noted that the City would make the computer available to Plaintiff as soon as Plaintiff advised that he agreed with this approach.  [Id.]

---

[2]Although Ms. Levy's September 15, 2008 letter is referenced as an attachment to Defendants' response to the motion for sanctions, the letter was not attached.  Thus, the Court requested, by letter, that Ms. Levy fax a copy of the letter to the Court and also file an amended response with the attached letter.  The Court received the faxed copy of the September 15 letter on November 10, 2008.

There apparently was no response from Plaintiff to defense counsel's proposal.  Instead, Costales filed the present motion for sanctions and request for an *in camera* review of the documents sealed in the envelope, and provided the envelope of sealed documents to the Court.[3]

In Defendants' response to the motion for sanctions, Ms. Levy repeated that "Unfortunately, due to a clerical error, the actual emails were  . . . delivered [to Plaintiff instead of the privilege log.]"  [Doc. 102, p. 3.]  Defense counsel also noted that she did not receive a response from Ms. McGinn regarding her proposal.  In addition, Defendants produced a log regarding Chief Schultz's calendar that set out more detail regarding his scheduled meetings.  [Doc. 102, p. 4, Ex. F.]

Discovery closed in this case on July 26, 2008.  [Feb. 26, 2008 Docket Entry.]  Pretrial motions were due by September 14, 2008.  The Court set this case for a jury trial on May 18, 2009.  [Doc. 96.]

Costales' motion for sanctions makes two requests:  (1) for discovery sanctions for Defendants' failure to timely produce all of the required documents either by July 22, 2008, or to date; and (2) for an *in camera* inspection by the Court and production of the e-mails of Chief Schultz which allegedly indicate a fraudulent intent to conceal information in this case.  [Doc. 99.]

**<u>Analysis</u>**

---

[3]Plaintiff's motion for discovery sanctions does not recite that Plaintiff made any attempt to determine whether the motion was opposed.  [Doc. 99.]  "[A] motion that omits recitation of a good-faith request for concurrence may be summarily denied."  D.N.M. LR-Civ 7.1(a).  If Plaintiff's counsel had attempted to confer with defense counsel before filing the motion for discovery sanctions, perhaps counsel could have resolved some of the issues raised in this motion.  At a minimum, Plaintiff should have responded to Defendants' proposal to resolve the question concerning Chief Schultz's calendar before requesting sanctions.  While the Court could summarily deny the motion for sanctions based on Plaintiff's counsel' omission of the good-faith request for concurrence, it elects not to do so in this case.  However, the parties are advised to make good faith attempts to resolve all disputes of this nature before filing motions in the future.  *See* <u>Hoelzel v. First Select Corp.</u>, 214 F.R.D. 634, 636 (D. Colo. 2003) (observing that a single e-mail stating that the plaintiff intended to file a motion to compel based on the defendant's refusal to respond to discovery requests was insufficient to satisfy the requirements that the parties make reasonable good faith efforts to confer with opposing counsel to resolve a disputed matter; to confer means more than making a demand for compliance; it means "to hold a conference; compare views; consult together.")

I.    **Motion for Discovery Sanctions**

Based on Costales' reply [Doc. 104], Defendants still have not produced the following discovery as directed by the Court's Discovery Order.[4]

A.    ***Pending Discovery Disputes***

**Interrogatory No. 5 & Request for Production No. 5**.  These discovery requests asked for information on all cell phones used by Chief Schultz from December 1, 2006 to January 21 [sic], 2007 and the records and bills from those cell phones.  [Doc. 89, p. 2.]  The Court directed Defendants to provide a log identifying by date, name and position every individual Chief Schultz called or from whom he received a call on his work cell phone between December 1, 2006 and January 31, 2007.  The Court noted in the Discovery Order that Chief Schultz need not disclose the identity of any confidential informant or any other person, the disclosure of whom could jeopardize an ongoing investigation or jeopardize someone's safety.  In addition, the Court did not require Chief Schultz to disclose any information regarding his personal cell phone.  [Doc. 89, p. 3.]

Costales states that he received a "partial response" to this discovery request on October 15, 2008, "the day before Defendant's response to the motion to compel [sic] was due and after Plaintiff's numerous attempts at a good faith resolution of this matter. . . ."  [Doc. 104, p. 5.] Costales explained that Defendants' response was in the form of copies of Chief Schultz's phone calls, with the phone numbers blacked out and a partial identification of the people Chief Schultz claims were on the other end of those phone calls.  Plaintiff asks for an unredacted copy of the phone records and argues that the partial listing also fails to provide the number and order of the conversations between the Chief and the identified individuals.  Plaintiff argues that the sequence

---

[4]Defendants' surreply did not clarify whether any of these discovery disputes had now been resolved. [Doc. 112.]

of calls and length of time spent speaking to certain individuals could be relevant to the claims in this case and might serve to contradict Chief Schultz's sworn deposition testimony regarding the length and number of calls made about Costales.  [Doc. 104, p.5.]

The cell phone log and billings are attached as Exhibit B to Plaintiff's reply.  [Doc. 104.] Defendants provided 23 pages of detailed cell telephone billings for the pertinent time frame, indicating date, time of day, rate, location (city), whether the call was incoming, outgoing or voice mail, and length of time.   A typical billing page contains 45 entries.   Defendants redacted all telephone numbers provided on these pages and wrote in the names of the individuals with whom the call was conducted.  In some instances, Defendants left blank spaces for the name of the caller or the person called.  There are 101 blank spaces for names out of approximately 1000 calls.  [Doc. 104, Ex. B.]  Defendants also supplied a two-page list of the names and positions of the persons identified in the billing pages.

Defendants agree that the cell telephone logs were not produced until October 15, 2008, but explain the delay was due to the difficulty in obtaining the actual itemized bills and the task of identifying the many calls.   They further stated they mistakenly believed they already had the records necessary to produce the log when they did not.   Defendants take responsibility for the lateness of the production and state they are willing to provide additional discovery if Plaintiff believes it is necessary.   While Defendants agree they are in violation of the Court's Discovery Order, they argue  that Plaintiff has not been prejudiced by the delay.  [Doc. 102, p. 4.]

Based on the language in the Court's Discovery Order, Defendants supplied the required information, including the date, name and position of callers or people called during the pertinent time frame.   Contrary to Plaintiff's assertion, the log does not appear to be a "partial listing." Moreover, the log or billings identify the person called and show the time of each call.  Plaintiff can

determine the order of calls made from this information. The billing pages also indicate how many minutes each call lasted.

To the extent that some of the callers or persons called were not identified, Defendants should supply a supplemental response explaining why those individuals were not identified. Defendants need not supply the actual telephone numbers that were redacted because the Court's Order did not require that disclosure in the first place. Defendants' supplemental response is due no later than fifteen (15) days after entry of this Memorandum Opinion and Order. The Court will address *infra* the overall lateness of Defendants' supplemental discovery responses.

**<u>Interrogatory No. 11</u>**. This interrogatory asked Defendants to describe any efforts they undertook to prevent retaliation against Costales. Initially, Defendants responded to this discovery request by referring Costales to the deposition testimony of Chief Schultz. Costales argued that Defendants must identify by page and line reference those sections of the testimony they believe answer the specific interrogatory.

In the Discovery Order, the Court directed Defendants to provide Costales with the specific references, including page and line numbers of Chief Schultz's deposition testimony that were responsive to this request. If additional information existed that was responsive to Interrogatory No. 11, Defendants were to provide that information as well. [Doc. 89, p. 4.]

Costales notes that Chief Schultz supplemented the response to this interrogatory but failed to provide page and line citations to his deposition testimony, or alternatively, to indicate no responsive information was contained in the deposition. Costales asserts that the City refused to provide further information and instead, stated the response complied with the Court's Discovery Order. [Doc. 104, p. 5, Ex. C.]

10

In a letter from Plaintiff's counsel to defense counsel, dated September 12, 2008, Ms. McGinn stated that APD completely disregarded the Court's Order in response to Interrogatory 11. Plaintiff's counsel stated that the City provided no citations by page and line references to Chief Schultz's deposition testimony. Plaintiff asked if he was to understand that there were no sections of Chief Schultz's deposition which the City believed were responsive to Interrogatory 11. If true, Plaintiff required the City to state this fact under oath. [Doc. 105, Ex. B.]

In response to Plaintiff's letter, Ms. Levy stated: "I respectfully disagree with your conclusion as to the supplementation regarding this matter. The interrogatory has bee [sic] propounded and answered under oath." [Doc. 105, Ex. C.] In Defendants' brief in opposition to the motion for sanctions, they stated that they had supplemented the answer under oath and that the Court did not mandate "a special format." [Doc. 102, p. 5.]

The Court directed Defendants to provide citations by page and line references to Chief Schultz's deposition testimony to the extent they were responsive to the interrogatory. If Defendants did not provide this information in their supplemental responses, they are directed to do so within fifteen (15) days after entry of this Memorandum Opinion and Order.

**Request for Production No. 2**. This document request asked for the personnel files of Costales, Dave Archunde, Lt. Brian Carr, James Badway and Conrad Candelaria, including disciplinary actions taken against them. The Court's Discovery Order directed Defendants to provide the files at issue to the Court for an *in camera* inspection and determination of what documents, if any, should be produced. [Doc. 89, p. 5.]

In Costales' reply he notes that he never received any indication that the files were produced to the Court for an *in camera* inspection. The files were provided to the Court along with a cover letter that contained a "cc: Randi McGinn, Esq. w/o enclosures." If Plaintiff did not receive a copy

11

of the cover letter the Court directs Defendants to provide Plaintiff with a copy of the September 12, 2008 cover letter by no later than fifteen (15) days after entry of this Memorandum Opinion and Order.[5]

**Request for Production No. 6.**  This document request asked for "copies of any e-mails sent or received on Defendant Schultz's computer from December 14, 2006 to the present, related to Al Unser's arrest or trial or to Plaintiff."  [Doc. 89, p. 6.]  Defendants raised a number of objections but the Court overruled them except as to e-mails that might be protected by the attorney-client privilege.  Defendants were directed to produce all responsive, non-privileged documents and a privilege log as to any documents being withheld due to a claim of privilege.  [Doc. 89, p. 6.]

Plaintiff stated that none of Chief Schultz's non-privileged e-mails for the December 14, 2006 to the present which related to Al Unser or Plaintiff were produced.  Plaintiff observes that the only e-mails produced were those that were inadvertently produced between Chief Schultz and his attorney.  Plaintiff further notes that Defendants did not produce a privilege log addressing any e-mails regarding Al Unser or Plaintiff for the specified time frame.  [Doc. 99, p. 5.]

Defendants state in their response that "non-privileged emails have in fact been produced; Plaintiff's statement is simply not true."  [Doc. 102, p. 5.]  Defendants referred Plaintiff to documents already produced.  In his reply, Plaintiff states that to date Defendants did not provide a privilege log and further explains that the actual emails responsive to this request are the subject of the instant motion.  [Doc. 104, p. 6.]  In contrast, Defendants' September 15, 2008 letter states that a privilege log was attached, providing the dates of e-mails to and from Chief Schultz which are claimed to be privileged.  [Doc. 104, Ex. C.]

---

[5]The Court has already ruled on what portions of these files were to be produced.  [Doc. 108.]

Plaintiff did not respond to Defendants' assertion that non-privileged e-mails already were produced. Thus, it is unclear whether Plaintiff is in possession of the responsive non-privileged e-mails. It is also unclear to the Court how Plaintiff can claim that the "actual emails responsive to this request are the subject of the instant motion" if Plaintiff's counsel did not review the actual e-mails and instead placed them in a sealed envelope. The Court assumes, based on the representations in Plaintiff's Motion, that although Plaintiff's counsel was advised of the alleged content of at least one of the e-mails by her paralegal, Plaintiff's counsel did not personally review the inadvertently disclosed e-mails.

The Court directs counsel to confer and confirm whether there are responsive, non-privileged e-mails and if so, whether they were already produced to Plaintiff. Defendants should be prepared to identify any such document by Bates numbers. If there are no responsive e-mails, other than those at issue in this motion, Defendants should confirm that a privilege log addressing these materials has already been provided. If an additional log is necessary, Defendants should provide this information to Plaintiff as well. All of this information not previously produced should be exchanged or produced within fifteen (15) days after entry of this Memorandum Opinion and Order.

These four discovery requests are the only specific discovery disputes addressed in Plaintiff's reply. [Doc. 104, pp. 5-6.] While the initial motion identified many other discovery disputes [Doc. 99, pp. 4-6], the Court assumes these matters were resolved by the parties during the briefing on the motion for sanctions.

Plaintiff argues that Defendants' production of much of the supplemental information was delivered well after the Court's deadline and that Plaintiff was required to make numerous requests to obtain the required supplemental information. Therefore, Plaintiffs asserts that sanctions should be imposed.

B.    ***Plaintiff's Request for Sanctions based on Defendants' Failure to Timely Comply with Court's Discovery Order***

1.    ***Rule 37 Sanctions:***

Rule 37 governs the issuance of sanctions when a party fails to comply with a court's order. Fed. R. Civ. P. 37(b).  A number of possible sanctions may be assessed against a party who fails to comply with a court's order, including "directing that the matters embraced in the order . . . be taken as established for purposes of the action, as the prevailing party claims," prohibiting the disobedient party from opposing designated claims or supporting certain defenses, or from introducing designated matters in evidence, dismissing the action, in whole or in part, and treating as contempt of court the failure to obey any order.  Fed. R. Civ. P. 37(b)(2)(A)(i-vii).

In addition, Rule 37 provides that instead of or in addition to the above-stated sanctions, the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

The Court has broad discretion in imposing any sanctions or a combination of sanctions it deems appropriate under Rule 37.  *See* Spire Denver, LLC v. Hypo Real Estate Capital Corp., 2008 WL 3833754 at *2 (D. Colo. Aug. 13, 2008) (internal citations omitted).  "Determination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make."  Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir.1992).  Dismissal of an action is "an extreme sanction" that is appropriate only if there has been "willful misconduct."  Id.

2.    ***Argument by Parties:***

14

Costales argues that sanctions are the only appropriate remedy for the prejudice caused him and to deter further discovery violations by Defendants.  [Doc. 104, p. 1.]  Costales contends that not only do Defendants' discovery failures in this case warrant sanctions, but that Defendants' failures in other unrelated lawsuits and alleged "past misconduct in other federal cases in this district" justify sanctions.  In support of the latter position, Plaintiff provides a table outlining "past misconduct by Defendants and sanctions imposed" in other federal lawsuits in this district.  [Doc. 104, pp. 3-4.]  In addition, Plaintiff supplies as exhibits orders and opinions assessing sanctions against Defendant City of Albuquerque or other City Defendants in other federal lawsuits.  [Doc. 104, Ex. A.]

In addressing Plaintiff's request for sanctions, the Court looks only to Defendants' conduct in this case.  The Court will not consider matters raised in unrelated lawsuits or opinions issued by this Court or other judges concerning discovery disputes in unrelated lawsuits.  A comparison of the circumstances in this case cannot be made with those in other cases, even if sanctions were assessed in other cases for various discovery violations.  Defendants are entitled to be judged based solely on their conduct in this case.

In this case, Plaintiff was previously forced to file a motion to compel additional discovery responses.  [Doc. 62.]  In response, the Court ordered supplementation of discovery by Defendants that was not produced until well past the Court-imposed deadline of July 22, 2008.[6]

Plaintiff's present motion for sanctions [Doc. 99] asks that the Court impose sanctions on Defendants for a number of reasons:  (1) Defendants' "inexcusable delay" in producing documents

---

[6]Plaintiff's earlier Motion to Compel [Doc. 62] did not request sanctions for Defendants' failure to make disclosures or to cooperate in discovery.  *See* Fed. R. Civ. P. 37(a)(5) (addressing payment of expenses when a motion to compel is granted).  The Court's Discovery Order [Doc. 89] similarly did not address the issue of possible sanctions against Defendants.

15

in accordance with the Court's Discovery Order and Defendants' "willful violation" of the Discovery Order; (2) Defendants' failure to produce many of the documents ordered by the Court until after the motion for sanctions was filed or their ongoing incomplete production of required documents; (3) a pattern of discovery misconduct by Defendants in this case, including delays in setting up a meet and confer conference, difficulties obtaining responses to numerous requests from Defendants, defense counsel's changing a conference date with other counsel, repeated failures by Defendants to respond to Plaintiff's requests for the City's portion of the JSR, the City's failure to timely provide its initial disclosures, the City's failure to provide the promised initial disclosures to Plaintiff until after the pretrial conference, the City's failure to timely produce, as requested, the relevant standard operating procedures and memoranda concerning Costales before Chief Schultz's deposition, the need to reschedule Chief Schultz's deposition because of Defendants' failure of production, discovery responses by Defendants that lacked substance even after Defendants were given several extensions of time, and the surprise appearance of documents at times that were advantageous only to Defendants; (4) Defendants' alleged failure to thoroughly search its records and files for responsive information; (5) Defendants' alleged "late, sloppy, haphazard and dishonest discovery production;" and (6) Defendants' production of documents "in spurts" two to three months after the close of discovery.[7]  [Doc. Nos. 99, 104.]

Costales proposes a number of different sanctions that he believes are justified under the circumstances.  First, he argues that an award of attorney fees "is a given in this case" because a prevailing party in a motion to compel is entitled to recover its expenses and reasonable attorney's

---

[7]Neither Defendants' response nor their surreply countered Plaintiff's version of what occurred during the discovery process, although it appears from exhibits attached to Plaintiff's motion for sanctions that Ms. Levy disagreed that Chief Schultz's deposition was delayed because of Defendants' untimely production of documents. [Doc. 99, Ex. C.]

fees.  [Doc. 99, p. 7.]  Plaintiff estimated his reasonable fees were $2,590.88, when he filed the opening motion for sanctions.  Plaintiff offered to provide an itemized bill or affidavit as needed.

Costales suggested the Court impose additional sanctions against Defendants upon an evaluation of the factors set out in Ehrenhaus, 965 F.2d at 920-21, including the degree of actual prejudice to a party, the amount of interference with the judicial process, the culpability of the litigant, whether the court warned the party in advance that dismissal of the action might be a likely sanction for noncompliance, and the efficacy of lesser sanctions.

Plaintiff argues that he suffered actual prejudice as a result of the late and failed discovery, particularly in view of the incomplete discovery that was produced long after the July 26, 2008 discovery deadline.  With respect to actual prejudice suffered, however, Plaintiff states nothing more than "Defendants' failure to provide complete discovery makes it impossible to know if additional discovery is necessary beyond the court's deadline."  [Doc. 99, p. 8.]

Plaintiff proposes that the Court impose one or more of the following sanctions:  entry of a judgment against Defendants on Count I, Count II and Count IV; production for use at trial of every e-mail from Chief Schultz which indicates he may commit fraud in discovery or not answer questions, etc.; entry of an order requiring Defendants to provide the original phone records for all Chief Schultz's work and cell phone calls; allow a computer expert selected by Plaintiff's counsel and paid for by Defendants to search Chief Schultz's work computer for information, e-mails and calendar records related to the Costales or Unser cases; and prohibit Defendants from affirmatively using any information, documents or exhibits at trial that were not produced in response to Plaintiff's discovery requests.  Finally, in the reply brief, Plaintiff suggests that "the most appropriate" sanction under the circumstances "is to tell the jury of the defendants' misconduct in

discovery, including the Chief's threat(s) to provide inaccurate or incomplete information." [Doc. 104, p. 8.]

Defendants respond that Plaintiff's claims of discovery abuse or prejudice are not supported by the record and that the trial is not scheduled until May 2009. Defendants contend that they have provided all discovery and that Plaintiff attempts to create a false issue. They further assert that sanctions, if any, should be commensurate with Defendants' failure to comply with the Court's Discovery Order rather than the extreme sanction of granting judgment in favor of Plaintiff on certain claims. [Doc. 102, p. 6.]

### 3.    *Sanctions Ruling:*

The Court will not recommend that the trial judge grant judgment on any of Plaintiff's claims based on the discovery violations that have occurred in this case or that the trial judge allow Plaintiff to use any or all of Chief Schultz's privileged e-mails concerning his calendar. Such sanctions are not warranted by the circumstances in this case. For one thing, Plaintiff has not demonstrated significant prejudice in view of the May 2009 trial date. In addition, Plaintiff has not shown sufficient culpability or "willful misconduct" on the part of Defendants to justify such a severe sanction. Likewise, Plaintiff has not shown that the belated production of discovery or incomplete discovery prevented him from engaging in substantive motion practice[8] or that Defendants' discovery practices interfered with Plaintiff's trial preparation. If Plaintiff believes that the incomplete disclosures or late production of documents warrants additional discovery, the Court will entertain a request to extend the discovery deadline for that purpose.

---

[8]There are no pending dispositive motions, and the deadline for filing such motions has passed.

The Court concludes, however, that some lesser sanctions are appropriate and just in this case because of Defendants' failure to provide complete disclosures in response to the deadline for production in the Court's Discovery Order.  Defendants' production was not only incomplete in some respects, it was two to four months late in some instances.  In addition, a number of discovery requests were not properly supplemented until Plaintiff filed a motion to compel and then a motion for discovery sanctions.  There continues to be outstanding discovery to be produced by Defendants approximately four months after discovery closed in this case, as evidenced by the rulings in this Memorandum Opinion and Order.[9]

The Court is also concerned with Plaintiff's description of Defendants' dilatory conduct with respect to the discovery process.  [Doc. 99, p. 9.]  For example, Plaintiff states that the City belatedly provided its required initial disclosures and supplied certain relevant and requested discovery only a day before Chief Schultz's scheduled deposition, thereby requiring Plaintiff to re-schedule the deposition.  In response to Plaintiff's allegations, Defendants state only that Plaintiff's claims of discovery abuse are not supported by the record.  [Doc. 102, p. 6.]  However, Defendants do not contest the specific allegations made by Plaintiff regarding the late production of initial disclosures and other discovery practices.  Moreover, Defendants state in their response to the motion for sanctions that Defendants "have produced all discovery."  As evidenced by the Court's rulings in this Memorandum Opinion and Order, that statement is not true.

Based on the foregoing, the Court determines that Defendants' failure to comply with the Court's Discovery Order and their failure to produce discovery in a timely manner are not

---

[9]Defendants attempted to "excuse" the delay in responding to the Discovery Order to a failure "to calendar" the deadline and the inadvertent disclosure of the e-mails between Chief Schultz and defense counsel to "a clerical error."  Such conduct can hardly be excused given the experience of defense counsel and especially when the cover letter and e-mails at issue were hand-delivered to Plaintiff's counsel by defense counsel herself.

substantially justified.  Thus, Defendants are ordered to pay Plaintiff's reasonable attorney's fees and expenses in filing and briefing the motion for sanctions.  Plaintiff's counsel is directed to submit an affidavit detailing the reasonable attorney's fees and expenses associated with filing this motion. The affidavit should be filed within fifteen (15) days after entry of this Memorandum Opinion and Order.  The Court will determine the reasonableness of the expenses and fees before ordering Defendants to submit payment to Plaintiff.

Defendants will also be precluded from offering any documents at trial as exhibits if they fall within the scope of any of Plaintiff's discovery requests as modified or ordered by the Court and were never produced to Plaintiff.

Defendants must also supply an affidavit signed by Chief Schultz that he has provided Plaintiff with a complete, unredacted calendar for the time period set forth in Request for Production No. 9.  The affidavit should address the completeness of the calendar, whether any omissions or redactions were made, and the reasons for any omissions or redactions.  This affidavit must be submitted to Plaintiff within fifteen (15) days after entry of this Memorandum Opinion and Order.

Finally, based on Defendants' own proposal, if requested to do so by Plaintiff, Defendants will allow Plaintiff's counsel to choose a computer specialist who will access Chief Schultz's computer to verify that the materials already produced are in fact Chief Schultz's complete calendar for the pertinent time frame.  This will be done at Defendants' expense, as also agreed to by Defendants.   The computer specialist should complete his or her examination of Chief Schultz's computer within thirty (30) days after entry of this Memorandum Opinion and Order.

Any failure by Defendants to meet the deadlines or fully and completely respond as set forth in this Memorandum Opinion and Order may result in a recommendation to the trial judge that the Court impose more severe sanctions as contemplated by Rule 37.

II.     **Request for *In Camera* Review**

Plaintiff seeks review and production of the emails between Chief Schultz and his attorney that were inadvertently disclosed by Defendants as described *supra*.  This issue focuses on the attorney-client privilege, a possible waiver of the privilege, or the crime/fraud exception to the privilege.

A.     ***Pertinent Legal Standard:  Attorney-Client Privilege***

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law."  In re Qwest Communications Int'l, 450 F.3d 1179, 1185 (10th Cir.) (*quoting* Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981), *cert. denied*, 127 S.Ct. 584 (2006)).  The purpose of the attorney-client privilege is to "encourage clients to make full disclosure to their attorneys."  Fisher v. United States, 425 U.S. 391, 403 (1976).  The attorney-client privilege protects from discovery communications made in confidence between a client and the attorney.  Upjohn Co., 449 U.S. at 395-96; In re Qwest Communications, 450 F.3d at 1185.  To warrant the privilege's protection, "a communication between a lawyer and client must relate to legal advice or strategy sought by the client."  United States v. Johnston, 146 F.3d 785, 794 (10th Cir. 1998), *cert. denied*, 525 U.S. 1088 (1999).

The party seeking to assert a privilege has the burden of establishing its applicability.  United States v. Lopez, 777 F.2d 543, 552 (10th Cir. 1985).  Here, the e-mail communications between counsel and her client regarding the production of requested discovery are protected by the attorney-client privilege.  They clearly were confidential communications between counsel and her client concerning legal advice with regard to this lawsuit.

B.     ***Inadvertent Disclosure or Waiver of Attorney-Client Privilege***

New Federal Rule of Evidence 502 limits waivers of attorney-client privilege. Fed. R. Evid. 502. The new rule was enacted on September 19, 2008 and took effect immediately. It is to be applied in all proceedings commenced after the date of enactment and in all proceedings pending on that date. Because this case was pending when the rule was enacted, it applies to the matter at hand. Rule 502 provides that when a disclosure of attorney-client privileged materials is made in a federal proceeding the disclosure does not operate as a waiver in a federal proceeding if the disclosure was inadvertent, the holder of the privilege took reasonable steps to prevent disclosure, and the holder promptly took reasonable steps to rectify the error, including (if applicable) following Fed. R. Civ. P. 26(b)(5). Fed. R. Evid. 502(b). *See also* Williams v. Sprint/United Management Co., 2006 WL 1867478 at *9 (D. Kan. July 1, 2006) (discussing five factors to determine whether privilege waived by inadvertent disclosure, including reasonableness of the precautions taken to prevent inadvertent disclosure, time taken to rectify the error, the scope of discovery, the extent of disclosure, and the overriding issue of fairness).

Here, Plaintiff does not expressly argue that Defendants waived the privilege by the inadvertent production to Plaintiff's office of an envelope containing e-mail correspondence between Chief Schultz and his attorney. Nor could Plaintiff do so successfully in view of the circumstances of this case, Fed. R. Evid. 502, and the general law concerning waiver of the attorney-client privilege.

It is clear that Defendants did not intend to disclose the actual e-mail correspondence between Chief Schultz and his attorney. The cover letter in the envelope delivered to the office of Plaintiff's counsel stated that a privilege log for the e-mails was being provided, rather than the actual e-mails. Thus, it was obvious that a mistake had been made and that the disclosure was inadvertent. Plaintiff's counsel admitted as much in her reply. "As soon as she [Plaintiff's counsel]

22

learned [Chief Schultz's statement] was from e-mails between Ms. Levy and Chief Schultz and she [Plaintiff's counsel] reviewed the cover letter indicating there was supposed to be a privilege log, rather than a production, no more information was transmitted and the documents were sealed for this court's review."  [Doc. 104, p. 2.]

Although Defendants did not take immediate steps to rectify their error, this was because they did not realize the error was made until it was brought to their attention by Plaintiff's counsel. Within a short time after production of the e-mails, Plaintiff's counsel realized the error.  She promptly and commendably sealed the communications and directed her paralegal not to speak further of the contents of the privileged communications.  Once defense counsel was alerted to the disclosure, she immediately wrote a letter explaining that a mistake was made in producing the actual e-mails.

In view of the minimal disclosure made, the prompt attention to the inadvertent disclosure, and concerns of fairness, the Court determines that there was no waiver of the attorney-client privilege.

C.   ***Crime/Fraud Exception to Attorney-Client Privilege***

In In re Grand Jury Subpoenas, the Tenth Circuit Court of Appeals addressed the crime-fraud exception to the attorney-client privilege:

> [T]he privilege is not worthy of protection "at all costs  . . . ." [ ] Because it "withhold[s] relevant information from the factfinder," United States v. Zolin, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citation omitted), the "attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud." Motley v. Marathon Oil Co., 71 F.3d 1547, 1551 (10th Cir.1995) (*quoting* In re Grand Jury Proceedings (Company X), 857 F.2d 710, 712 (10th Cir.1988)). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission

23

of a fraud' or crime." <u>Zolin</u>, 491 U.S. at 563, 109 S.Ct. 2619
(citations omitted).

<u>In re Grand Jury Subpoenas</u>, 144 F.3d 653, 659-60 (10th Cir.), *cert. denied*, 525 U.S. 966 (1998).

The Court further noted:

> To invoke the crime-fraud exception, the party opposing the privilege
> must present prima facie evidence that the allegation of attorney
> participation in the crime or fraud has some foundation in fact.  The
> evidence must show that the client was engaged in or was planning
> the criminal or fraudulent conduct when it sought the assistance of
> counsel and that the assistance was obtained in furtherance of the
> conduct or was closely related to it.  The exception . . . appl[ies] if the
> assistance was used to cover up and perpetuate the crime or fraud.

<u>Id.</u> (internal citations omitted).[10]  The author of the leading treatise regarding the attorney-client

privilege and the crime-fraud exception states that "[p]rocedurally, in order to claim this exception

to the privilege, the proponent seeking to pierce the privilege must first make a *prima facie* showing

that a crime or fraud has occurred."  Edna Selan Epstein, 1 <u>The Attorney-Client Privilege and the</u>

<u>Work-Product Doctrine</u>, p. 671 (5th Ed. 2007).  She further writes that "more than mere allegations

usually must be adduced," before the crime-fraud exception pierces the privilege.  <u>Id.</u>

    Plaintiff contends that the Court should review the sealed and privileged e-mails between

defense counsel and Chief Schultz because the crime-fraud exception to the attorney-client privilege

applies in this case.  In support, Plaintiff argues that the crime-fraud exception is applicable based

on the information contained in an e-mail reviewed by Plaintiff's paralegal concerning Chief

Schultz's alleged statement that he would go to jail before producing his true calendar.  Because of

---

[10]Contrary to the circumstances in <u>In re Grand Jury Subpoenas</u>, where there was "substantial and competent evidence" presented to show the client had committed a crime, used the legal services of its attorneys in furtherance of the crime, and that the attorneys were aware of the criminal conduct, 144 F.3d at 661, such is not the case here. *See* discussion *infra*.

the alleged contents of that e-mail, Plaintiff asserts that there may be information in the other e-mails

about Defendants' "committing fraud in producing materials in discovery."  Plaintiff states:

> The content of the single disclosed e-mail communication . . . is
> sufficient to persuade a reasonable person that a further review of that
> e-mail and the other e-mails contained in the production by Ms.
> Levy, might reveal evidence to establish the crime-fraud exception.

[Doc. 99, p. 14.]  In Plaintiff's reply, Costales further argues that not only does the content of the

one troubling e-mail support the crime-fraud exception to the privilege, but so too does Defendants'

year-long "history of delay and obfuscation" of discovery in this case.  [Doc. 104, p. 9.]

Defendants oppose the Court's *in camera* review of the sealed e-mails between counsel and

Chief Schultz.  They argue that the Court lacks *prima facie* evidence of the crime-fraud exception,

in part because Plaintiff did not present evidence that the "allegations *of attorney participation in*

*crime or fraud* has some foundation in fact."  (*relying on* Motley, 71 F.3d at 1551 (10th Cir. 1995),

*cert. denied*, 517 U.S. 1190 (1996)) (emphasis added by Defendants).  Defendants also contend that

because Plaintiff does not claim that defense counsel furthered a crime or fraud, the crime-fraud

exception to the privilege is inapplicable.  [Doc. 102, p. 7.]

The determination of whether Plaintiff has made a *prima facie* case that "the allegation of

attorney participation in crime or fraud has some foundation in fact" is left to the sound discretion

of the court.  Motley, 71 F.3d at 1551 (internal citations omitted).  The decision whether to conduct

an *in camera* review similarly is left to the sound discretion of the court.  Id. at 1551-52.

Here, the Court finds that Plaintiff has not shown a "factual basis adequate to support a good

faith belief by a reasonable person that *in camera* review of the [e-mails] may reveal evidence to

establish that the crime-fraud exception applies."  *See* id.  First, the Court is unpersuaded that

Defendants' year-long dilatory discovery practices, even if confirmed as true, are evidence of

perpetration or participation in a crime or fraud.  While the Court does not look favorably on Defendants' discovery practices, as is evidenced by the sanctions awarded, the Court does not find this conduct sufficient to establish that the crime-fraud waiver should be applied in this case.

In addition, the Court is not convinced that Plaintiff has made a *prima facie* showing that a crime or fraud has occurred.  *See* Epstein, 1 <u>The Attorney-Client Privilege and the Work-Product Doctrine</u>, p. 671.  Plaintiff's allegations are speculative at best, e.g., the "further review of that e-mail and the other e-mails contained in the production by Ms. Levy, *might* reveal evidence to establish the crime-fraud exception."  [Doc. 99, p. 14] (emphasis added).

Third, it is doubtful that Plaintiff can rely on the privileged contents of the e-mail in dispute as evidence of a crime or fraud on the Court and counsel.  *See* <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1372 (10th Cir. 1997) (there was no "record evidence" to support the contention that the advice sought was to perpetrate a crime or fraud).  The e-mail at issue is not evidence of record. Defendants claim they provided a privilege log demonstrating that the e-mail at issue was privileged. The Court has determined the e-mails produced to Plaintiff were privileged and that the production was inadvertent.  Thus, there was no waiver of the privilege.

While Plaintiff may know the alleged contents of that e-mail, it cannot be used as evidence of a crime or fraud.  *See* Epstein, 1 <u>The Attorney-Client Privilege and the Work-Product Doctrine</u>, p. 671 ("It is clear . . . that more than mere allegations usually must be adduced, *while the contested documents themselves,* purportedly should not be used to bootstrap the findings of crime or fraud.") (emphasis added).  *See also* <u>Zolin</u>, 491 U.S. at 574-75 (finding that the "threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged").  Thus, having determined that the e-mails are privileged, the Court cannot allow Plaintiff to use the content allegedly contained in the e-mail(s) in support of his

26

motion. Although the Court cannot put the e-mail back in the bottle, the Court can prevent the use of the e-mail and any information contained in the e-mail. Otherwise, there would be no point in ruling that the documents, and therefore, the information in the documents, were protected by the attorney-client privilege.

Even if the e-mail could be used to support Plaintiff's contention of a crime or fraud, it simply is not sufficient. The alleged contents of the e-mail, as described by Plaintiff, do not evince criminal or fraudulent activity. Instead, they relate to a discussion between client and counsel regarding production of documents as ordered by the Court. There is no evidence to show that defense counsel advised Chief Schultz not to produce a true copy of his calendar. To the contrary, Defendants have offered (and are required) to supply an affidavit from Chief Schultz concerning the production of his calendar and to pay for a computer technician's confirmation that the true and complete contents of the calendar were produced. This should satisfy Plaintiff's concerns.

For the above-stated reasons, the Court determines that Plaintiff did not present "*prima facie* evidence that the allegation of attorney participation in the crime or fraud has some foundation in fact." While a lesser evidentiary showing is needed to trigger *in camera* review than that which is required to overcome a privilege, the Court concludes that an *in camera* review of the privileged and sealed e-mails, under the facts and circumstances of this case, is not justified. *See* <u>Zolin</u>, 491 U.S. at 571-72 (setting forth applicable legal standards).

IT IS THEREFORE ORDERED that Plaintiff's Motion for Discovery Sanctions is granted in part and denied in part, as described herein. All documents that the Court ordered to be produced by Defendants must be provided to Plaintiff within fifteen (15) days after entry of this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that Plaintiff's request for *in camera* review is denied. Defendants should pick up the sealed envelope of documents from the Court's chambers within fifteen (15) days after entry of this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that Defendants provide to Plaintiff an affidavit signed by Chief Schultz addressing the completeness of the calendar he produced, along with an explanation of any omissions or redactions that were made;

IT IS FURTHER ORDERED that Defendants pay for a forensic examination of Chief Schultz's computer as outlined above within thirty (30) days if requested to do so by Plaintiff;

IT IS FURTHER ORDERED that Defendants are precluded from offering documents at trial as exhibits if they fall within the scope of any of Plaintiff's discovery requests as modified or ordered by the Court and were never produced to Plaintiff;

IT IS FURTHER ORDERED that the failure to meet the deadlines or to fully and completely respond as set forth in this Memorandum Opinion and Order may result in a recommendation that the trial judge impose more severe sanctions on Defendants; and

IT IS FURTHER ORDERED that Defendants pay Plaintiff his reasonable attorney's fees and expenses, in relation to bringing and filing the motion for sanctions; Plaintiff's counsel is directed to supply the Court with an affidavit detailing the request for attorney's fees and expenses within fifteen (15) days after entry of this Memorandum Opinion and Order.

**HON. ALAN C. TORGERSON**
**United States Magistrate Judge**